<u>FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW JERSEY

- - - - - - - - - - - - - - - - - - - - - - - - - -X

In re:   ROBERT AMOS and
      LINDA AMOS,

                               Chapter 13
                               Case No:  11-10440 (RTL)

                Debtors

- - - - - - - - - - - - - - - - - - - - - - - - - -X

<u>**OPINION**</u>

**APPEARANCES**:

REINHEIMER & REINHEIMER
Linda S. Reinheimer, Esq.
Attorneys for Debtors

McKENNA, DuPONT, HIGGINS & STONE, P.C.
Michael R. DuPont, Esq.
Attorneys for First Financial Federal Credit Union

Howard Schmidt, Esq
Attorney for the Standing Chapter 13 Trustee

**RAYMOND T. LYONS, U.S.B.J.**

## I.     <u>INTRODUCTION</u>

       Debtors, Robert and Linda Amos, seek confirmation of a chapter 13 plan in which they propose to cure the arrears on a mortgage loan secured by a second home in the Poconos area of Pennsylvania, while also maintaining substantial monthly payments on that property.  The plan proposes to make no payments to unsecured creditors.  Because the plan was not proposed in good faith, confirmation is denied.

1

## II.   **JURISDICTION**

This confirmation hearing arises under 11 U.S.C §§ 1324-1325.  The court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a) and (b), 28 U.S.C. § 157(a), and the Standing Order of Reference by the United States District Court for the District of New Jersey dated July 23, 1984, referring all proceedings arising under Title 11 of the United States Code to the bankruptcy court.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(L) (confirmation of plans).

## III.   **FACTS AND PROCEDURAL HISTORY**

Robert and Linda Amos filed their bankruptcy petition and plan of reorganization simultaneously.  Their Schedules E-F disclose a total of $40,974.12 in unsecured debts, primarily owed on credit cards.  The Amoses list two pieces of real property on their Schedule A.  The first is their residence, valued at $299,000 and encumbered by a first mortgage of approximately $308,000 and a second mortgage of approximately $35,000.  The second is a property they describe as an investment property, located in Lake Ariel, Pennsylvania (the "Poconos Property"), which they value at $211,000.[1] This property is encumbered by a single mortgage of approximately $233,000.

The Amoses' Schedule I lists a combined average monthly take-home income of $8,591.18.  This figure includes $170.83 per month in rental income from the Poconos Property.[2] Their Schedule J lists average monthly expenses of $7,915, including $1,997 per month for the mortgage payment on the Poconos Property and $125 in monthly association dues for this

---

[1] The Standing Chapter 13 Trustee obtained an opinion of value for this property at $184,000.

[2] At the confirmation hearing, the Amoses' counsel argued that this figure is low, and that future rental income is expected to be greater.

property.[3]  Accounting for these expenses leaves $676.18 in monthly net income.  However, because the Amoses' annualized current monthly income is greater than the applicable median family income, they were required to complete certain sections of Form 22C in order to calculate their monthly disposable income.  This calculation results in negative monthly disposable income.

The Amoses propose a reorganization plan calling for 60 monthly payments of $862. They propose to apply plan payments primarily towards curing arrearages on the first mortgages on their residence and the Poconos Property, in the amounts of $18,500 and $26,754, respectively.  The balance of the plan payments will go to administrative costs.  The plan proposes to pay nothing on account of unsecured claims, including the $35,000 second mortgage on their residence, which they seek to strip off and reclassify as unsecured.  In addition to the monthly plan payments, the Amoses propose to continue monthly payments on each of the first mortgages, in the monthly amounts of $2,689 for the residence and $2,015.74 for the Poconos Property.

The holder of the second mortgage, First Financial Federal Credit Union, has filed a good faith objection to confirmation.  First Financial calls the Poconos Property a vacation home and argues that it is an unnecessary luxury.  First Financial further notes that the funds proposed to be applied towards curing a $26,754 arrearage and making monthly payments in excess of $2,000 could provide a substantial dividend to unsecured creditors.

Albert Russo, the Standing Chapter 13 Trustee, indicated at the confirmation hearing that he would normally object to this sort of plan, but he did not do so in this case because he had

---

[3] Other expenses for the Poconos Property, such as taxes, insurance, utilities, repairs, and maintenance are not separately listed on Schedule I.

3

little to add to the objection already filed by First Financial. Subsequently, he filed a document

styled as a factual history, in which he also argues that the plan is not proposed in good faith.

IV.    **APPLICABLE STATUTORY PROVISIONS**

Section 1325 of the Bankruptcy Code provides the requirements for a confirmable plan of

reorganization under chapter 13.  Relevant to the instant proceeding, these requirements include

that the plan be proposed in good faith. 11 U.S.C. § 1325(a)(3).  Further, where the trustee or the

holder of an unsecured claim objects, the plan must either provide for full payment of the

unsecured claim or call for all of the debtor's projected disposable income during the life of the

plan to be paid towards unsecured claims.  11 U.S.C. § 1325(b)(1).  Disposable income is

calculated by deducting reasonably necessary expenses from current monthly income. 11 U.S.C.

§ 1325(b)(2).  Where the debtor's income is above the applicable median family income,

reasonably necessary expenses are calculated under a formula which includes allowances

promulgated by the Internal Revenue Service as well as payments on secured debt.  11 U.S.C.

§§ 1325(b)(3), 707(b)(2).

V.    **DISCUSSION**

The Amoses' plan, and specifically the proposed payments related to the Poconos

Property, presents three separate questions for the court.  First, what is their monthly disposable

income, and does their plan call for payments to unsecured creditors equal to the full amount of

this income projected over the life of the plan, as required by § 1325(b)(1)(B)?  Second, should

the court engage in a separate good faith inquiry, independent  of § 1325(b)(1)(B)?  And finally,

if a separate good faith inquiry is required, is the plan here proposed in good faith?

a.    **Projected Disposable Income**

As discussed above, the Amoses' Form 22C indicates that their annualized current monthly income is greater than the applicable median family income. Thus, under § 1325(b)(3), their monthly disposable income must be calculated under the formulaic approach provided in § 707(b)(2). This formula is implemented by Parts IV and V of Form 22C, which show a negative monthly disposable income for the Amoses. In arriving at this result, the Amoses took a deduction for payments on debt secured by the Poconos Property – approximately $2,460 per month including monthly payments on the mortgage as well as catch-up payments on the arrearage.

The next step is to determine the Amoses' *projected* disposable income. In most cases, where a debtor's financial condition is not subject to significant changes that are known or virtually certain, projected disposable income is calculated by simply multiplying the monthly disposable income by the number of months in the plan. *Hamilton v. Lanning*, 130 S. Ct. 2464, 2471 (2010). Here, no changes to the Amoses' financial condition are alleged. Thus, their projected disposable income is effectively $0 under a straightforward application and extrapolation of § 707(b)(2),

However, before accepting these calculations at face value, the court will examine the propriety of the disposable income deductions claimed under § 707(b)(2), particularly those related to payments on the Poconos Property. These deductions are based on § 707(b)(2)(A)(iii), which authorizes deductions for (1) cure payments, spread over a period of 60 months, and (2) contractually due monthly payments during this period. While there is no limitation on the latter, the former is limited to cure payments related to certain types of collateral: a "debtor's primary residence, motor vehicle, or other property necessary for the support of the debtor and the debtor's dependents." The Amoses' deduction related to catch-up payments on the Poconos

5

Property is clearly improper under this subsection, as that property cannot be characterized as necessary for their support.

The propriety of deductions for contractually scheduled mortgage payments, on the other hand, presents a closer question. The Amoses would argue that these deductions are permitted under a straightforward reading and application of § 1325(b)(3)'s incorporation of § 707(b)(2), which, according to some accounts, was intended to create a standardized framework for determining disposable income by eliminating any case-by-case discretion of the bankruptcy courts. *See, e.g.*, *In re Randle*, 358 B.R. 360, 364 (Bankr. N.D. Ill. 2006) ("Congress' intent to use a standardized or mechanical test and avoid reliance on individualized information as much as possible is demonstrated throughout § 707(b)(2).") (citing Report of the Committee on the Judiciary, House of Representatives, to Accompany S. 256, H.R.Rep. No. 109-31, Pt. 1, p. 553, 109th Cong., 1st Sess. (2005)); *In re Barr*, 341 B.R. 181, 185 (Bankr. M.D.N.C. 2006) (citing same legislative history). *Contra Lanning*, 130 S. Ct. at 2475 ("We decline to infer from § 1325's incorporation of § 707 that Congress intended to eliminate, *sub silentio*, the discretion that courts previously exercised when projecting disposable income to account for known or virtually certain changes.") (citing *In re Liverman*, 383 B. R. 604, 613 & n.15 (Bankr. N.J. 2008)).

In light of this apparent intent, many courts were unwilling to adjust or re-examine the result of a proper application of the statutory formula, adopting what has been called a "mechanical approach." *See, e.g.*, *Stapleton v. Mundy (In re Mundy)*, 363 B.R. 407, 413 (Bankr. M.D. Pa. 2007), abrogated by *Lanning*, 130 S. Ct. 2464, as stated in *DeHart v. Smith (In re Smith)*, 438 B.R. 69, 76 (Bankr. M.D. Pa. 2010); *Maney v. Kagenveama (In re Kagenveama)*, 541 F.3d 868, 874 (9th Cir. 2008), abrogated by *Lanning*, 130 S. Ct. 2464, as stated in *Coffin v.*

6

*eCast Settlement Corp. (In re Coffin)*, 435 B.R. 780, 788 n.14 (B.A.P. 1st Cir. 2010); *In re Ross-Tousey*, 549 F.3d 1148 (7th Cir. 2008), abrogated by *Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716 (2011), as stated in *In re Willems*, 442 B.R. 918, 919 (Bankr. E.D. Wis. 2011).

Of course, as indicated by the citations to the opinions adopting this approach, two recent Supreme Court decisions have rejected this mechanical approach in favor of what can be called a "forward-looking," "flexible," or "realistic" approach.  *See Hamilton v. Lanning*, 130 S. Ct. 2464 (2010); *Ransom v. FIA Card Servs., N.A.*, 131 S. Ct. 716 (2011).

In *Lanning*, the Court held that, in calculating projected disposable income, the mechanical approach is only a starting point, subject to adjustment for changes in "income or expenses that are known or virtually certain at the time of confirmation."  130 S. Ct. 2471, 2475. The Court reasoned that the use of the term "projected" in § 1325(b)(1)(B) indicates that projected disposable income should not be calculated by simply assuming that a debtor's past income will continue into the future. 130 S. Ct. 2471.

Of some relevance here, the outcome in *Lanning* also overrules a number of decisions, *e.g.*, *Stapleton v. Mundy (In re Mundy)*, 363 B.R. 407 (Bankr. M.D. Pa. 2007), holding that a chapter 13 debtor may, under § 1325(b)(3)'s incorporation of § 707(b)(2)(A)(iii), deduct payments relating to secured debt where the collateral is to be surrendered.  As a surrender of collateral means a release of obligations to make payments on the associated debt, it is a known change to projected income or expenses.  *See DeHart v. Smith (In re Smith)*, 438 B.R. 69, 76 (Bankr. M.D. Pa. 2010).

If *Lanning* applied a realistic, circumstance-specific approach to the income element of the disposable income calculation, then *Ransom* can be understood to impose a requirement that the expense element of the calculation also have some basis in reality, rather than being the result

of a mechanical application of a formula.  In *Ransom*, the Court rejected the notion that

§ 707(b)(2) allowed a standard, IRS-promulgated deduction for "Ownership Costs" related to an

automobile even where a debtor owns the vehicle and makes no loan or lease payments on it.

131 S. Ct. at 730.  In so holding, the Court relied on § 707(b)(2)(A)(ii)(I)'s language limiting

standard deductions to a debtor's "applicable monthly expense amounts."  *Id*. at 724.  The Court

read this language to require a debtor to "qualify for a [standard] deduction by actually incurring

an expense in the relevant category." *Id*. at 725.

While *Ransom* and *Lanning* did not deal with the precise factual context presented in this

case – specifically, the use of § 707(b)(2)(A)(iii) to claim a disposable income deduction for

actual payments on account of a secured debt where debtors plan to retain the collateral and

continue making payments on it, even though doing so is neither reasonable nor necessary[4] –

these decisions cast significant doubt on the continued vitality of the mechanical approach in any

context.  Viewed together, these decisions suggest a willingness to inject judicial discretion both

into the applicability of specific deductions allowed under § 707(b)(2)'s means test and into the

---

[4] On the specific question of whether secured debts must relate to reasonably necessary collateral
in order to be deductible under § 707(b)(2)(A)(iii), the majority position is that no such
requirement exists for scheduled monthly payments.  KEITH M. LUNDIN & WILLIAM H. BROWN,
CHAPTER 13 BANKRUPTCY § 485.1, at ¶ 22 (4th ed. rev 2009), www.ch13online.com (collecting
cases).  Courts adopting this position reason that, in view of the express inclusion of a necessity
requirement for deductions related cure payments under this subsection, the lack of an express
requirement in the parallel subsection is dispositive. *Id*.  There are, of course, a minority of
courts who take the opposing view.  *Id*. at ¶ 23.  As the majority view represents an essentially
mechanical approach, the minority view appears more appropriate for the reasons discussed in
this section of the opinion.  From a purely statutory standpoint, however, it is notable that
§ 707(b)(2)'s means test is incorporated into § 1325(b)'s disposable income test as the method
for determining "amounts *reasonably necessary* to be expended" for above-median-income
debtors.  11 U.S.C. § 1325(b)(3) (emphasis added).  Accordingly, this court favors the minority
position and views all of the § 707(b)(2) deductions through the lens of § 1325(b)'s "reasonably
necessary" language, at least for the purposes of the disposable income test.  To view
§ 707(b)(2)(A)(iii) any differently would be to willfully ignore the whole tenor and purpose of
§ 1325(b)'s disposable income test.

calculation of "projected disposable income" from the "disposable income" figure derived from that means test.  In particular, the *Ransom* decision refused to accept that Congress intended the means test, which was conceived as a remedy for perceived bankruptcy abuses by above-median debtors, to allow preferential treatment of such debtors – specifically, by allowing them deductions that would never be permitted for other debtors. 131 S. Ct at 725 n.5.  The Court went on to note that means-test deductions "serve merely to ensure that debtors in bankruptcy can afford *essential* items."  *Id*. at 730 (emphasis added).

Given the Supreme Court's recent disapproval of the mechanical application of § 1325(b)(3) and § 707(b)(2), it is questionable whether the Amoses are allowed deductions for any and all secured debts under § 707(b)(2)(A)(iii), without regard to the nature and purpose of the collateral.  The Poconos Property is not an essential item, nor does it represent a reasonable and necessary expense. Were they below-median-income debtors, the Amoses would certainly be disallowed from claiming a disposable income deduction for mortgage payments on this property.

Nevertheless, even if these deductions were disallowed, the other standard deductions under § 707(b)(2) would still result in negative disposable income under §1325(b)(3).  As this calculation results in no projected disposable income, § 1325(b)(1)(B) does not require any payments to unsecured creditors, and the Amoses' plan meets the requirements of this subsection.

### b.      The Good Faith Requirement is Independent of § 1325(b)(1)(B)

As noted above, § 1325(a)(3) requires a plan to be proposed in good faith in order for it to be confirmed.  Thus, from a purely statutory vantage, good faith is an inquiry wholly independent of the disposable income requirement of § 1325(b)(1)(B).  Many courts agree.  *E.g.*,

*In re Sandberg*, 433 B.R. 837 (Bankr. D. Kan. 2010) (collecting cases); *In re Predragovic*, No.

10-60259, 2010 Bankr. LEXIS 2719, at *5-*9 (Bankr. N.D. Ohio Aug. 16, 2010); *In re Daniel-*

*Sanders*, 420 B.R. 102, 106 (Bankr. W.D.N.Y. 2009) ("To obtain confirmation of a Chapter 13

plan, debtors must fulfill a number of statutory conditions, only one of which is the disposable

income requirement of 11 U.S.C. § 1325(b)(1). Even when a debtor proposes to commit her

'projected disposable income' toward the funding of a plan, she creates no safe haven from

compliance with every other provision of section 1325 of the Bankruptcy Code."); *In re Styles*,

397 B.R. 771, 774 (Bankr. W.D. Va. 2008).

However, some courts have suggested that the latter subsection acts as a sort of safe

harbor that pre-empts an independent good faith inquiry. *E.g.*, *In re James*, 379 B.R. 903, 908

(Bankr. D. Neb. 2007) ("[A]bility to pay factors are subsumed into § 1325(b), and not in the

good faith standard of § 1325(a)(3). A debtor does not fail the good faith test simply because of

the ability to pay more than the means test result."); *In re Farrar-Johnson*, 353 B.R. 224, 231-

232 (Bankr. N.D. Ill. 2006) (holding that disposable income test eliminated any good faith

inquiry into whether a "plan proposed substantial or meaningful repayment to unsecured

creditors" and that good faith no longer has an "economic component," at least for above-median

debtors) (citing 3 KEITH M. LUNDIN, CHAPTER 13 BANKRUPTCY § 193.1 (3rd ed. 2006)); *In re*

*Barr*, 341 B.R. 181, 186 (Bankr. M.D.N.C. 2006) ("[T]he court concludes that with an above-

median-income Chapter 13 debtor, the debtor's ability to pay and whether the proposed plan

commits all of the debtor's disposable income must be determined under section 1325(b) rather

than as an element of good faith under section 1325(a)(3)."); *In re Austin*, 372 B.R. 668, 683

(Bankr. D. Vt. 2007) (agreeing with *In re Farrar-Johnson*). *But cf.* Eugene R. Wedoff, *Judicial*

*Discretion to Find Abuse Under Section 707(b)(3)*, 71 MO. L. REV. 1035 (2006) (arguing against

the analogous position that, in light of the means test, financial considerations are irrelevant to chapter 7's "abuse" inquiry in § 707(b)(3)).

This court agrees with those decisions holding that § 1325(a)(3)'s good faith test is an independent authority for examining economic components of a proposed plan, even where the disposable income test is satisfied.  Indeed, the court believes that *Lanning* supports this conclusion, as it rejected the idea that § 1325 represented an implicit limitation on the pre-existing discretion of bankruptcy courts.  130 S. Ct. at 2475.  Such an implicit contraction of the good faith inquiry would also seem contrary to another recent Supreme Court case, in which the Court inferred a good faith requirement where the applicable statutory section, § 706, did not expressly impose one.  *Marrama v. Citizens Bank*, 549 U.S. 365, 374-375 (2007).  In so doing, it held that bankruptcy courts have "broad authority . . . to take any action that is necessary or appropriate 'to prevent an abuse of process' described in § 105(a) of the Code." *Id*. at 375.

Here, the Amoses seek relief – namely, confirmation – that is expressly conditioned on good faith under § 1325(a)(3).  Reading § 1325(b)(3)'s formulaic approach to the disposable income calculation to somehow implicitly limit this clear good faith requirement seems imprudent :

> Congress retained § 1325(a)(3)'s good faith requirement for confirmation when it enacted BAPCPA in 2005 and appended to subsection (b) the more detailed and objective disposable income test. Congress made no effort to limit the existing case law concerning the good faith requirement. Two canons of statutory construction compel the conclusion that good faith remains alive and well as a separate and independent requirement for confirmation, notwithstanding compliance with the disposable income test. First, when Congress adopted BAPCPA, it is presumed to have had knowledge of the existing requirements for confirmation, including the interpretations given by the bankruptcy courts to the good faith requirement. Second, interpretation of statutes that render language superfluous are disfavored.

*In re Sandberg*, 433 B.R. at 848. More pointedly, in view of this subsection's provenance as an amendment contained in the Bankruptcy *Abuse Prevention* and Consumer Protection Act, Pub. L. No. 109-8, § 102(h), 119 Stat. 23, 33 (2005) (emphasis added), the argument strains belief. Accordingly, the court holds that deductions used in calculating a debtor's projected disposable income, even when those deductions are expressly authorized by statute, are not exempt from a separate good faith analysis.

    **c.**    **Good Faith Analysis**

As outlined above, the Amoses' proposed plan seeks discharge of over $40,000 in unsecured debts, primarily credit card debts, without paying any dividend to the associated creditors, all while retaining the Poconos Property and devoting a substantial portion of their income to payments on that property. Further, the plan seeks to strip off a second mortgage of over $35,000, converting that debt to an unsecured claim, meaning that this creditor will also receive nothing. In sum, the Amoses propose to obtain a chapter 13 discharge of over $75,000 of debt, without repayment of any portion thereof, while paying more than $2,500 per month, over 60 months, towards non-essential property. The court finds this to be an abuse of chapter 13, which should serve as a repayment tool. *Ransom*, 131 S. Ct. at 727 (referencing the disposable income test's "overall purpose of ensuring that debtors repay creditors to the extent they can"). The architecture of chapter 13 is essentially a bargain, allowing debtors to keep property only by agreeing to make some meaningful payment to creditors. *See Lanning*, 130 S. Ct. at 2468-69 ("Unlike debtors who file under Chapter 7 and must liquidate their nonexempt assets in order to pay creditors, Chapter 13 debtors are permitted to keep their property, but they must agree to a court-approved plan under which they pay creditors out of their future income."). For the payment to be meaningful, it should have some basis in a debtor's ability to pay. *See id*. at 2476

12

(rejecting as "senseless" a statutory interpretation that "would deny creditors payments that the debtor could easily make").

Here, the Amoses seek to retain a second house that they characterize as "investment property." Yet, by any reasonable measure, it is a poor investment. The property is underwater – it is worth approximately $22,000 less than the amount of the debt encumbering it. Furthermore, it produces only $170 in average monthly rental income while imposing monthly expenses of $125 in association dues and over $2,000 in mortgage payments, not including utilities and maintenance costs. Even worse, the mortgage on the property is over $26,000 in arrears. This property is simply not profitable; under normal circumstances, a prudent investor would be happy to surrender the property in exchange for a discharge of personal liability for the deficiency on the mortgage.

Thus, the Amoses are being disingenuous in characterizing the property as an investment. It is, instead, a luxury – perhaps a vacation home, perhaps a weekend home, perhaps a retirement home. Whatever it is, it is neither an investment nor necessary to reorganization. While chapter 13 allows a debtor to retain property, the debtor must make a good faith attempt to repay creditors in order to justify this benefit. A plan such as the one proposed here has no place in chapter 13, which is a tool for reorganization and repayment of debts, not some sort of byzantine sport in which debtors can reap benefits, at the expense of creditors, by successfully navigating a maze of technicalities.

As a final note, were the court to accept the means-test expenses as representing the Amoses' economic reality, it would have to accept the fiction that they are unable to pay more towards unsecured debts. However, if the court were to engage in this fiction, the plan would remain unable to satisfy § 1325(a)(6), which requires feasibility. If the court were forced by the

means test to accept that the Amoses have no disposable income,[5] the court would be unable to find that they have the ability to pay $862 monthly towards plan payments, as proposed.

However, if the Amoses can in fact afford to pay $862 per month as they propose, then by surrendering the Poconos Property and eliminating the related expenses, they would be able to afford a substantial payment to unsecured creditors.

## VI.   <u>CONCLUSION</u>

The Amoses have proposed to cure and maintain a mortgage on an unnecessary second house, while proposing no payments on account of substantial unsecured debts.  While the proposed plan does not fail the disposable income test, all of its provisions, including economic aspects governed by the disposable income test, remain subject to an independent good faith requirement.  Because the Amoses' proposed plan represents an attempt to avoid making payments that they could easily afford, it fails to satisfy this good faith requirement. Confirmation is denied.

Dated:  June 28, 2011                          /s/ *RAYMOND T. LYONS*

---

[5] The court recognizes that the means test contains deductions for most of the expenses towards which these plan payments are intended to apply – specifically, administrative expenses under § 707(b)(2)(A)(ii)(III) and mortgage arrearages under § 707(b)(2)(A)(iii)(II).  However, even if these deductions were ignored, the disposable income calculation under § 1325(b)(3) would still be negative.